**K–B BUILDING, CO., Appellant,**

**v.**

**SHEESLEY CONSTRUCTION, INC., Ara Barber, Angeline Barber and Cenwest Bank A Division of First Commonwealth Bank, Appellees.**

Superior Court of Pennsylvania.

Submitted Jan. 27, 2003.

Filed Oct. 3, 2003.

Vincent J. Barbera, Somerset, for appellant.

Myron I. Markovitz, Johnstown, for Barber, appellees.

Denver E. Wharton, Johnstown, for Cenwest Bank, appellee.

BEFORE: JOYCE, BOWES and BECK, JJ.

OPINION BY BOWES, J.:

¶ 1 K–B Building, Co. ("K–B") appeals the June 12, 2002 order dismissing this action on the basis that the statute of limitations had expired. In this appeal, we address the proper construction of the statute of limitations under section 5109 [1] the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S. §§ 5105–5110 (the "UFTA"), effective February 1, 1994, as to transfers made on or after that date. We reverse and remand.

¶ 2 On September 20, 2001, K–B instituted this action to set aside a fraudulent transfer that occurred among Sheesley Construction, Inc. ("Sheesley"), Ara and Angeline Barber (who are husband and wife), and Cenwest Bank ("Cenwest"), Appellees. In its complaint, K–B alleged the following material facts. K–B lost its industrial division in August 1993 through the misconduct of Hermara Associates, Inc. ("Hermara"), James Barber, who is the son of Ara and Angeline, and other unnamed individuals. In November 1993, K–B instituted an action against Hermara, James, and the unnamed individuals, and

---

1. Our review of decisions of other jurisdictions reveals that section 5109 is referred to as both a statute of limitations and a statute of repose. The language of the provision, which involves the extinguishment of a cause of action rather than a limitation on the action, would appear to be labeled properly as a statute of repose. However, the comment to section 5109 refers to that provision as imposing a statute of limitations. We will refer to the section in accordance with the comment.

in October 1996, a jury entered a verdict in favor of K–B in the amount of $360,000. In 1993, both Hermara, the defendant in the 1993 action, and Sheesley, one of the defendants in this action, were owned by the Barber family. Ara was the sole shareholder of Sheesley, and Angeline and James were the majority and minority shareholders, respectively, of Hermara. James served as president of both companies.

¶ 3 K–B also alleged the following. In 1994, while the action by K–B was pending against Hermara and James, Ara and Angeline entered into an agreement with James to sell him their stock in Sheesley and Hermara for $300,000. Thereafter, James, Ara, and Angeline, with the complicity of Cenwest, drained the assets of Sheesley for James to use in purchasing the Sheesley and Hermara stock. The sale was carried out in the following manner. First, Cenwest gave Sheesley a $300,000 loan that was secured by a mortgage and security interest in Sheesley's business, real estate, and equipment. Sheesley immediately "loaned" James $300,000, and then James transferred the $300,000 back to Cenwest to secure an irrevocable standby letter of credit[2] in favor of Ara and Angeline to secure James's obligation to pay the $300,000 stock purchase price. Cenwest was allegedly not only aware of the scheme to deplete Sheesley's assets to enable James to pay his parents $300,000, but participated in it.

¶ 4 The allegations contained in the complaint continued as follows. Sheesley did not receive reasonably equivalent value for the loan by Cenwest because the funds largely were sent, with Cenwest and Sheesley's knowledge, to James and back to Cenwest, and ultimately to Ara and Angeline. Cenwest did not provide full consideration for its mortgage and security interest in Sheesley's assets because at least $269,000 ostensibly loaned by Cenwest to Sheesley was immediately paid back to Cenwest. Sheesley derived no corresponding benefit from the loan to James and the subsequent transfer of the funds. Cenwest and Sheesley allegedly both knew the ultimate beneficiaries of the transaction were Ara and Angeline, not Sheesley. Thus, the funds were transferred without adequate consideration by Sheesley to James, then to Cenwest, and ultimately to Ara and Angeline.

¶ 5 K–B alleged that the aforementioned transaction was carried out by Sheesley, Ara, Angeline, and James with the actual intent to hinder, delay, and defraud Sheesley's creditors. Ara, Angeline, James, and Sheesley never intended that James would pay the $300,000 purchase price for the Sheesley and Hermara stock with his own assets; instead they planned on generating that money by depleting Sheesley's assets. Thus, the $300,000 received by Ara and Angeline was, in reality, a distribution of Sheesley's corporate assets to its shareholders made in an attempt to defraud its creditors. The fraudulent transfer ultimately rendered Sheesley insolvent.

¶ 6 After K–B obtained its judgment in the 1993 action against James and Hermara for the loss of its industrial division, K–B discovered that Hermara's assets had been drained in order to avoid paying the $360,000 judgment entered in that action. Specifically, K–B learned that Hermara's assets had been fraudulently transferred to Sheesley, the defendant in this action. As a result, K–B filed two lawsuits under the UFTA, one in 1997 against Sheesley,

**2.** As holders of an irrevocable letter of credit, Ara and Angeline had only to instruct Cenwest in accordance with the terms of the letter, and Cenwest was obligated to pay them the amount of the demand.

and the other in 1999 against James. K–B was successful in both of those actions and obtained a judgment against Sheesley in the 1997 action on January 17, 2001. In the meantime, as noted, Sheesley's assets had been diverted to Ara and Angeline. Hence, K–B commenced this action.

¶ 7 After the pleadings were closed in this action, Cenwest moved for summary judgment on the basis that the applicable statute of limitations had expired; Ara and Angeline joined in that motion. The trial court granted the motions and the action was dismissed by order dated June 12, 2002.[3] This appeal followed.

¶ 8 The thrust of K–B's claim is that Sheesley fraudulently transferred the bulk of its assets to Ara and Angeline in the $300,000 stock transaction with the complicity of James and Cenwest; it seeks now to undo that transfer. K–B levels three challenges to the trial court's determination that this action was barred by the applicable statute of limitations. We consider those claims in the order they are presented.

¶ 9 First, K–B maintains that the statute of limitations did not begin to run until January 17, 2002, when it obtained a judgment against Sheesley, the entity whose assets were transferred fraudulently. However, the trial court found, and we agree, that this position is inconsistent with the language of the relevant statute.

¶ 10 The UFTA applies to transfers made on or after February 1, 1994, and sets forth circumstances under which certain transfers or obligations incurred by a debtor may be deemed to be fraudulent. When those circumstances are satisfied, the statute allows a creditor to avoid the transfer or obligation. The record in this case indicates that the transfers herein occurred after the effective date of the UFTA. At the time of the transfer, K–B was not a creditor but became one thereafter.

¶ 11 Section 5104 of the UFTA describes the requirements for establishing fraud where the conveyance in question concerns a future creditor.[4] Once the creditor es-

---

**3.** The court granted summary judgment in favor of Cenwest, Ara, and Angeline. Since the record establishes that Sheesley went bankrupt and has not been in existence since September 1999, the order had the effect of terminating this action as to all viable defendants. Thus, it is a final order.

**4.** Section 5104, Transfers fraudulent as to present and future creditors, provides:

(a) General Rule.—A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

(b) Certain Factors.—In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

tablishes the existence of a fraudulent transfer or obligation, the creditor may, *inter alia,* avoid the transfer or obligation, attach the transferred assets or other property of the transferee, obtain an injunction barring further transfers, or seek appointment of a receiver over the transferred asset. 12 Pa.C.S. § 5107(a).

¶ 12 The statute-of-limitations provision of the UFTA, section 5109, entitled "Extinguishment of cause of action," provides in relevant part as follows:

> A cause of action with respect to a fraudulent transfer or obligation under this chapter is extinguished unless action is brought:
>
> (1) under section 5104(a)(1) (relating to transfers fraudulent as to present and future creditors), within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant;
> . . .

12 Pa.C.S. § 5109(1).

■ ¶ 13 K–B, as a future creditor, had to bring this action within four years of the transfer or within one year after the transfer or obligation was or could reasonably have been discovered by K–B. As noted, K–B initially claims, "[T]he Statute of Limitations [did] not begin to run on the fraudulent transfer claim in question until K–B first obtained its judgment against Sheesley Construction, Inc., which occurred on January 17, 2002." Appellant's brief at 8. This position does not comport with the language of 12 Pa.C.S. § 5109, which provides that an action must be brought within one year of the date the transfer could have been discovered through the exercise of reasonable diligence or within four years of the transfer. The statute does not toll the statute of limitations in instances where the creditor-debtor relationship stems from a judgment obtained in a lawsuit.

¶ 14 K–B's reliance on *ProtoComm Corp. v. Novell, Inc.,* 55 F.Supp.2d 319 (E.D.Pa.1999), is misplaced since that case was based on the now-repealed Uniform Fraudulent Conveyances Act, which contained a counterpart to section 5109. K–B also asks us to apply *Cortez v. Vogt,* 52 Cal.App.4th 917, 60 Cal.Rptr.2d 841 (1997), which holds that the four-year statute of limitations contained in section 5109 is tolled until judgment is entered against the debtor in an underlying lawsuit if the creditor's right to proceed under the UFTA is established in that lawsuit.

¶ 15 *Cortez* has been roundly criticized and is against the weight of authority in this area. *Moore v. Browning,* 203 Ariz. 102, 50 P.3d 852 (App.2002) (*Cortez* court erred in ruling statute of limitations of UFTA is tolled until creditor obtains judgment in underlying action); *accord SASCO 1997 NI, LLC v. Zudkewich,* 166 N.J. 579, 767 A.2d 469 (2001); *Gulf Insurance Co. v. Clark,* 304 Mont. 264, 20 P.3d 780 (2001); *Levy v. Markal Sales Corp.,* 311 Ill.App.3d 552, 244 Ill.Dec. 120, 724 N.E.2d 1008 (1st Dist.2000); *First Southwestern Financial Services v. Pulliam,* 121 N.M. 436, 912 P.2d 828 (App.1996).

(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

¶ 16 The comment to section 5109 of the UFTA indicates that it has no counterpart in its predecessor statute and observes that the statutes of limitations applicable to fraudulent transfers vary widely from state to state and frequently are applied with uncertainty. Section 5109 was designed to mitigate both the diversity of decisions applying the statute of limitations and the uncertainty inherent in those cases.

¶ 17 The approach employed in *Moore* and other cases rejecting the reasoning in *Cortez* furthers this purpose and is consistent with the express language of the statute. Hence, we decline to follow *Cortez* and its holding that the statute of limitations embodied in section 5109 of the UFTA is not triggered until entry of an underlying judgment in favor of the creditor.

¶ 18 We will address K–B's second and third arguments together. K–B alleges that the completion date of the fraudulent transfer is not apparent on the face of the record. Specifically, it argues that the transfer may have begun with Cenwest's 1994 loan to Sheesley, which was a matter of public record since it was secured by a mortgage recorded that year. However, K–B notes, Cenwest gave that mortgage to Sheesley with the understanding that the funds would be transferred to James, who would transfer them back to Cenwest as security for an irrevocable standby letter of credit in favor of Ara and Angeline Barber. The loan was a vehicle that enabled Cenwest to transfer Sheesley's assets to Ara and Angeline Barber pursuant to the letter of credit, while those assets posed as collateral on the loan secured by the 1994 mortgage. K–B contends that it did not discover the transfers at issue until February 2001, when it was reviewing correspondence related to the stock scheme.

¶ 19 K–B posits that while the initial transfers from Cenwest to Sheesley, from Sheesley to James, and from James to Cenwest occurred in 1994, the date of the final transfer, the transfer from Cenwest to Ara and Angeline, is unknown. K–B alleges that "until the $300,000.00 was transferred to Ara and Angeline Barber, the fraudulent transfer was incomplete," and this final transfer would not have occurred until some later unknown date that could have been recent enough to save this action from the statute of limitations. Appellant's brief at 12.

¶ 20 Thus, K–B contends that the trial court erred in determining that it should have known of the transfers by September 1, 2000. K–B observes that the 1994 mortgage from Sheesley to Cenwest appeared to be an ordinary business transaction. It states that until February 2001, when K–B discovered correspondence that revealed the subsequent transfers to James, to Cenwest, and then to Ara and Angeline, it was not aware of all the transactions that form the basis for this UFTA cause of action. K–B suggests that entry of summary judgment based upon the statute of limitations was inappropriate since the court failed to examine the record in the light most favorable to K–B, the non-moving party.

¶ 21 At this juncture, we note the applicable burden of proof and standard of review in this context. We exercise plenary review over a trial court's grant of summary judgment. *Philadelphia Ambulatory Care Center, Inc. v. Rite Aid Corp.*, 805 A.2d 613, 614 (Pa.Super.2002). " 'Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting *Curry v. Huron Insurance Co.*, 781 A.2d 1255, 1257

(Pa.Super.2001)). We view the record and resolve any doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *Philadelphia Ambulatory Care Center, supra.*

■ ¶ 22 Mindful of our standard of review, we have examined the record in the present action, which consists of the pleadings and the motion for summary judgment. While the complaint itself indicates that the initial $300,000 loan and the secondary transfers between Sheesley, James, and Cenwest all occurred in 1994, there is no indication in any pleading as to when Ara and Angeline drew on the letter of credit issued by Cenwest. Furthermore, the record does not contain a single document establishing when K–B knew or should have known of the entire allegedly fraudulent scheme. Cenwest's motion for summary judgment contains a sole factual allegation relevant to when K–B knew or should have known of the 1994 transfers. Cenwest alleged that K–B "engaged in extensive discovery pursuant to previous litigation, which discovery would have disclosed the subject transfer as early as 1994 and no later than November 1997." Motion for Summary Judgment, 3/25/02, at ¶ 7. This allegation is completely unsupported by the record in this case since the only document attached to the motion is a copy of the 1994 recorded mortgage. Ara and Angeline Barber joined in the motion without attaching any documents to their joinder motion, and K–B denied the allegation that it knew or should have known of the entire fraudulent transfer scheme based on documents disclosed during discovery in the prior fraudulent transfer actions. Response in Opposition to Motion for Summary Judgment, 4/22/02, at ¶ 3.

¶ 23 Cenwest, Sheesley, Ara, and Angeline had the burden of establishing their entitlement to summary judgment. In this case, the 1994 mortgage, which is the only document attached to the motion for summary judgment, discloses only one facet of the series of transfers that allegedly drained the corporate assets. The mortgage does not indicate that the loan proceeds would be channeled to James under a loan and that James allegedly would then funnel the loan proceeds back to Cenwest as security for an irrevocable stand-by letter of credit to be held by Ara and Angeline. Thus, K–B correctly asserts that the documents of record in this action fail to demonstrate that the transaction was completed in 1994. We do not know when Ara and Angeline drew upon their letter of credit. The record, viewed in the light most favorable to K–B, also fails to establish when K–B knew or should have known of the subsequent fraudulent transfers that were not a matter of public record. Consequently, a question of material fact exists as to that key issue.

¶ 24 In deciding whether to grant the motion for summary judgment, the trial court focused primarily on the fact that the mortgage was recorded in 1994. It then relied upon the discovery conducted in the 1997 and 1999 actions, stating:

Nearly eight years have elapsed since the mortgage was recorded, if this constitutes the time when "the transfer was made or the obligation was incurred" under both §§ 5104 and 5109. The transcript in the previous consolidated 1997 and 1999 cases references 19 exhibits including 1993 docket entries, eight tax returns of Hermara and Sheesley, trial testimony from the previous case, James Barber's 1997 tax return and extensive references in the transcript, including references to mortgage notes, bonds payable (Non–Jury Trial Notes of Testimony, No. 1997–4663, 1999–1459, August 1, 2001, pg. 76), inner-company loans (*Id.*, pg. 91), and present counsel's own argument referencing "transfers of mon-

ey or incurring of obligations at the end of each year, 1993, 1994, 1995 and 1996, the total $300,000." (N.T., August 2, 2001, pg. 85) and counsel's position that "... from 1993 to 1996 this was a subterfuge to transfer all the cash which was all of Hermara's assets to Sheesley." (*Id.,* pg. 90).

This Court, after examining the record in a light most favorable to the nonmoving party and giving the plaintiff the benefit of all reasonable inferences drawn from the well-pleaded facts, has narrowed the question to whether the plaintiff could have reasonably discovered the transfer or obligation within one year of the time the action was brought. A review of pertinent dates is essential. Plaintiff filed the most recent complaint on September 20, 2001. Plaintiff filed a Certificate of Readiness on June 13, 2000 in its case against Sheesley (1997–4663), and filed its Pre-trial Statement and motion for consolidation in the 1997 and 1999 cases on September 1, 2000. The plaintiff, therefore, had made reasonable effort to discover the cause of the injury underlying its 1997 and 1999 cases, which cause is echoed in its newest case, and it is concluded that the plaintiff was aware of the mortgage note in question on September 1, 2000. Under the PUFTA, the deadline for the plaintiff to have reasonably discovered the transfer or obligation is September 20, 2000. It is concluded that the plaintiff through the exercise of reasonable diligence was aware of the transfer at least by September 1, 2000.

Trial Court Opinion, 6/12/02, at 6–7 (footnote omitted).

¶ 25 None of the aforementioned documents referenced in the trial court's opinion is included in the record in this action. While the trial court obviously had access to those records and was familiar with them, those documents are not part of this record, and cannot serve as a basis for the grant of summary judgment.

■ ¶ 26 Again, we refer to another ensconced principle of appellate review:

[T]his Court must rely solely on the contents of the certified record, and we therefore do not consider ... unsubstantiated (and contradictory) allegations in considering the merits of [an] appeal. *See* Pa.R.A.P. 1921 (setting forth the composition of the record on appeal); *Bennyhoff v. Pappert,* 790 A.2d 313, 318 (Pa.Super.2001) (stating "for purposes of appellate review, what is not of record does not exist."). . . .

*Warfield v. Warfield,* 815 A.2d 1073, 1074 n. 1 (Pa.Super.2003).

¶ 27 In this case, the existing record cannot sustain the grant of summary judgment on the basis of the statute of limitations. We stress that with appropriate documentation provided in the record in this case, dismissal based on application of the statute of limitations may be appropriate. Therefore, our decision is expressly made without prejudice to Appellees' ability to renew their motion for summary judgment and incorporate the appropriate documents in this record to establish that K–B knew or should have known of this transfer more than one year prior to the date that this action was instituted.

¶ 28 Order reversed. Case remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.